UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 08-6476(DSD/JJK)

Joseph and Carolyn Friedberg,

       Plaintiffs,

v.                                                           **ORDER**

Chubb & Son, Inc., and Chubb
Indemnity Insurance Company,

       Defendants.

    Steven E. Wolter, Esq., Stacy L. Kabele, Esq. and Kelley, Wolter & Scott, P.A., 431 South Seventh Street, Suite 2530, Minneapolis, MN 55415 and Jenneane L. Jansen, Esq., Kris E. Palmer, Esq. and Jansen & Palmer, LLC, 4746 Elliot Avenue South, Minneapolis, MN 55407, counsel for plaintiffs.

    David E. Bland, Esq. and Robins, Kaplan, Miller & Ciresi, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court upon cross motions for summary judgment by defendants Chubb & Son, Inc. and Chubb Indemnity Insurance Company (collectively, Chubb) and plaintiffs Joseph and Carolyn Friedberg; motions to exclude expert witnesses by Chubb and the Friedbergs[1]; and the motion to strike declarations by Chubb.[2] Based on a review of the file, record and proceedings herein, and

---

[1] The Friedbergs motion and memorandum in support were filed after oral argument. Because the motion is related to Chubb's motion and raises similar issues, the court addresses the Friedbergs' motion.

[2] Because the court grants summary judgment in favor of the defendants, the motion to strike is moot.

for the following reasons, the court grants defendants' motion for summary judgment.

## BACKGROUND

This insurance coverage dispute arises out of the Friedbergs' 2001 purchase of Masterpiece Policy 12281532-04 (the Policy) from Chubb. The Policy covers the Friedbergs' home in Wayzata, Minnesota, and provides "coverage against all risk of physical loss to your house or other property covered under this part of your Masterpiece Policy, unless stated otherwise or an exclusion applies." Wolter Aff. Ex. 4, at CI00169. The Policy contains several exclusions, including:

> **Gradual or sudden loss** (Rot Exclusion). We do not provide coverage for the presence of wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping, however caused, or any loss caused by wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping. We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies (Ensuing Loss Provision).
>
> ...
>
> **Fungi and Mold** (Mold Exclusion). We do not provide coverage for the presence of mold, however caused, or any loss caused by mold, other than as provided under the Extra Coverage, [m]old remediation expenses. But we do cover mold resulting from fire or lightning unless another exclusion applies. "Mold"

> means fungi, mold, mold spores, mycotoxins, and the scents and other byproducts of any of these.
>
> ...
>
> **Faulty planning, construction or maintenance** (Construction Defects Exclusion). We do not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance. It does not matter whether the faulty acts, errors or omissions take place on or off the insured property. But we do insure ensuing covered loss unless another exclusion applies. "Planning" includes zoning, placing, surveying, designing, compacting, setting specifications, developing property and establishing building codes or construction standards. "Construction" includes materials, workmanship, and parts or equipment used for construction or repair.

Id. at CI00176-78.

The Friedbergs' home was constructed with an exterior insulation and finish system (EIFS) manufactured by nonparty Dryvit Systems, Inc (Dryvit). In June 2002, the Friedbergs received notice of a proposed settlement in a class-action suit concerning water damage associated with Dryvit EIFSs. See Bland Decl. Ex. C, ECF No. 78. On November 20, 2003, the Friedbergs signed and returned the "Claimant Information" form to Dryvit. See id. Ex. D. As part of the claims process, an inspector surveyed the Friedbergs' home. See id. Ex. E. The inspector recommended $9,321.75 in remedial work, of which $3,728.70 was to be reimbursed

by Dryvit as part of the class-action settlement. <u>Id.</u> The Friedbergs did not perform the proposed remedial work. <u>See</u> J. Friedberg Dep. 128:4-129:12.

In December 2006, the Friedbergs hired nonparty Donnelly Stucco to repair a small hole in the exterior of their home. Bestland Decl. Ex. A, at CI00023. Donnelly Stucco discovered extensive water damage. <u>Id.</u> at CI00032. The Friedbergs notified Chubb on January 22, 2007. <u>Id.</u> at CI00031. On January 31, 2007, Chubb adjuster Scott Bestland and expert Larry Gubbe inspected the Friedbergs' home. Sample cuts into the home's exterior revealed water intrusion causing rot, mold and damage to the home's wood framing and insulation. <u>See</u> <u>id.</u> Ex. B at CI00244-78. Bestland's "Inspection Report" noted the failure of the EIFS: "[I]t appears that Dryvit has failed due to no vertical 'control/expansion' joints that result in Dryvit cracking because it cannot expand or contract. Once the Dryvit cracks, moisture can get behind resulting in deterioration within the exterior walls .... Also, evidence of poor design and workmanship." <u>Id.</u> Ex. A, at CI00023.

Gubbe inspected the Friedbergs' home again in April 2007, after the Dryvit cladding had been removed. In a July 23, 2007, report, Gubbe detailed the results of the January and April inspections, noting water damage to the home's architectural beams, roof deck, and sheathing and framing members. Gubbe Decl. Ex. A at CI00073, CI00075-76. Gubbe concluded that the damage to the

architectural beams and underlying walls was "primarily caused by the failure to install control joints or otherwise to provide for differential movement which caused the beams to develop cracks through which water could penetrate the EIFS cladding." Id. Ex. A at CI00078. Further, Gubbe found that "the damage attributable to inadequate design and construction of the beams ... has been cumulatively occurring over a period of several years" and was not "attributable to a single event such as a storm or other climatic phenomena." Id.

The Friedbergs' consultant M. Steven Doggett inspected the residence in June 2010 and reviewed roughly 1600 photographs of the damage. See Doggett Dep. 35:16-36:2, 44:1-6. Doggett testified that design and construction defects allowed external water intrusion. Id. at 86:16–87:19. The external intrusion accounted for eighty percent of the damage to the home. Id. Ex. 2, at 3. Doggett concluded that "[t]he primary mechanisms for moisture intrusion included unsealed joints and cracks at wall penetrations, window cladding, roof penetrations, roof membrane terminations, parapet cap flashing, wall cladding, and sealent joints." Id. Doggett explained that improper roof repair was the primary cause of the damage on the upper portions of the residence and that the mechanism of water intrusion in lower parts of the residence was

due to the roof and "[e]ntry through terminations of the EIFS; entry at rough openings of windows and other wall penetrations; [and] flashing details." Id. at 88:13–19.

On August 7, 2007, Chubb denied the Friedbergs' claim on the basis that the damage sustained was excluded under the Policy. Bestland Decl. Ex. D, at CI00081. According to Chubb, based on the inspections, "it was evident that water has intruded via the exterior roof and wall for sometime, resulting in gradual deterioration." Id.

On December 3, 2008, the Friedbergs filed a complaint in state court, seeking a declaration that the Policy covers the damage to their home and asserting breach of contract and estoppel claims. Chubb timely removed. The Friedbergs moved for partial summary judgment before the parties engaged in discovery. See ECF No. 81, at 1. The court denied the motion, because it was unclear whether the evidence might show that an excluded peril was the overriding cause of the loss. See ECF No. 48. Following discovery, the parties now make cross motions for summary judgment and to exclude certain expert testimony.

**DISCUSSION**

**I.   Expert Testimony**

Chubb seeks to exclude the testimony of the Friedbergs' experts Thomas Irmiter, Michael Opela and M. Steven Doggett based

6

on lack of qualifications and use of unreliable methods. The Friedbergs seek to exclude Chubb's expert Larry Gubbe based on use of unreliable methods. The court limits its analysis to Doggett and Gubbe.[3]

### A. Qualifications

"The admissibility of expert testimony in diversity cases is governed by federal law." Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005). Federal Rule of Evidence 702 provides that:

> [i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the court acts as a gatekeeper to determine "whether the witness is qualified to offer expert testimony." Schmidt v. City of Bella Villa, 557 F.3d 564, 570 (8th Cir. 2009) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)).

---

[3] These are the two experts relied on for purposes of this order. The court notes, however, that the Friedbergs' additional experts, Irmiter and Opela, reach a similar conclusion as Doggett. Both opine that faulty roofing allowed water to enter the Friedbergs' residence. See Irmiter Dep. 178:8-22, 180:1-181:1; Opela Dep. Ex. 2.

An expert must possess the "knowledge, skill, experience, training or education sufficient to assist the trier of fact." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (citation and internal quotation marks omitted). This standard is satisfied when the expert's testimony "advances the trier of fact's understanding to any degree." Id. Rule 702 "requires that the area of the witness's competence matches the subject matter of the witness's testimony." Id. at 1101 (citation and internal quotation marks omitted). "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." Id. at 1101. The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. See Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).

Chubb accepts Doggett's qualification to testify about the deterioration of building materials, but argues that he is not qualified to testify about the mechanism of water entry and the cause of the deterioration. In addition to a Ph.D in ecology and post-doctoral training in mycology, Doggett is the principal at Built Environments, Inc., a firm that specializes in the assessment and design of buildings. Doggett Decl. ¶¶ 1-2. Doggett has served as the principal investigator for over thirty buildings where EIFS was the sole cladding system, and has performed over 1000 hours of

8

hygrothermal analysis[4] of EIFS assemblies.  See id. ¶ 4. Therefore, Doggett is qualified to opine not only on microbial growth, but also on water damage and routes of entry.

**B.   Reliability**

The court must also "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Schmidt, 557 F.3d at 570 (citing Daubert, 509 U.S. at 589). The court considers several nonexclusive factors when determining the reliability of an expert's opinion, including:

> (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether the theory has been generally accepted; ... [5] whether the expertise was developed for litigation or naturally flowed from the expert's research; [6] whether the proposed expert ruled out other alternative explanations; and [7] whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

Lauzon, 270 F.3d at 686-87 (citations and internal quotation marks omitted).  This "flexible and fact specific" inquiry allows the court to "use, adapt or reject [the] factors as the particular case demands."  Unrein, 394 F.3d at 1011.

Both sides seek to exclude the opposing expert, because his conclusions are based on photographs rather than a method that

---

[4] Hygrothermal analysis studies the movement of water and heat through buildings.

physically tests and independently confirms a hypothesis. In short, each side seeks to disqualify an expert for using the method employed by its own expert. The court is unpersuaded. It would be nearly impossible and cost-prohibitive to construct a true and accurate model of the Friedbergs' home in order to test each expert's theory. Both experts relied on photographic evidence, neither performed a "spray test"[5] and both experts visited the property, albeit for only a few hours. The court finds that the methods employed provides a verifiable basis for opinion. Accordingly, the court denies the motions to exclude the testimony of Gubbe and Doggett.

## II. Insurance Coverage

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

---

[5] A test that determines where water migrates after making contact with a hard surface.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. The evidence must be more than merely colorable; the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 249–50. If a claimant cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322–23.

### A. Interpretation of the Policy[6]

In Minnesota the interpretation of an insurance policy is a question of law. Am. Family Ins. Co. v. Walser, 628 N.W.2d 605, 609 (Minn. 2001). The court interprets an insurance policy in accordance with general principles of contract construction, giving effect to the intent of the parties. Thommes v. Milwaukee Ins.

---

[6] Chubb argues that the Friedbergs' claim is barred by the two-year statute of limitations in the Policy. The court need not address this issue, because the court grants summary judgment in favor of Chubb. The court does note, however, that when viewing the facts in a light most favorable to the Friedbergs, a genuine issue of material fact exists as to when the Friedbergs were aware or should have been aware of their loss.

Co., 641 N.W.2d 877, 879 (Minn. 2002). The court gives unambiguous language its plain and ordinary meaning, and construes ambiguous language against the drafter and in favor of the insured. Id. at 880; Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co., 615 N.W.2d 341, 344 (Minn. 2000). Language is ambiguous if "reasonably subject to more than one interpretation." Columbia Heights Motors, Inc. v. Allstate Ins. Co., 275 N.W.2d 32, 34 (Minn. 1979). However, the court "guard[s] against invitations to find ambiguity where none exists." Metro. Prop. & Cas. Ins. Co. v. Jablonske, 722 N.W.2d 319, 324 (Minn. Ct. App. 2006) (citation and internal quotation marks omitted).

The insured must first establish a prima facie case of coverage. SCSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305, 311 (Minn. 1995), overruled on other grounds by Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 919 (Minn. 2009). If coverage is established, the burden shifts to the insurer to prove that a policy exclusion applies. Id. at 313. The court strictly construes exclusions against the insurer, in light of the insureds' expectations. Thommes, 641 N.W.2d at 880. If the insurer demonstrates that an exclusion applies, the insured bears the burden of proving an exception to the exclusion. SCSC Corp., 536 N.W.2d at 314.

### B. Prima Facie Case of Coverage

The Friedbergs argue that coverage exists because their home suffered a physical loss. The court agrees. The Policy provides "coverage against all risk of physical loss to your house." Wolter Aff. Ex. 4, at CI00169. As detailed in Gubbe's report, the Friedbergs' home suffered a physical loss, specifically, damage to the home's architectural beams, roof deck, and sheathing and framing members. Gubbe Decl. Ex. A, at CI00075-76. Therefore, the Friedbergs make a prima facie case for coverage, and the burden shifts to Chubb to show that the Policy excludes the loss.

### C. Construction Defects Exclusion

The Construction Defects Exclusion excludes "any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance." Wolter Aff. Ex. 4, at CI00178. The Policy defines "caused by" to mean "any loss that is contributed to, made worse by, or in any way results from that peril." Id. at CI00176. The Friedbergs argue that "loss" means "financial detriment," and as a result, the Construction Defects Exclusion is limited to the replacement of faulty construction.

Even assuming that the word "loss" means financial detriment, the Policy excludes the losses incurred by the Friedbergs. The Friedbergs argue that language in the Acts of War and Nuclear or Radiation Hazard exclusions show that the Construction Defects Exclusion only excludes construction defects and not resulting

13

loss. The Acts of War and Nuclear or Radiation Hazard exclusions add the language "any consequence of any of these acts regardless of any other direct or indirect cause or event, whether covered or not, contributing in any sequence to the loss." Wolter Aff. Ex. 4, at CI00178. This anti-concurrent causation language shows that the parties agreed that the doctrine of concurrent causation would not apply to acts of war and nuclear or radiation hazards. The absence of such language in the other exclusions only shows that the parties did not contract around concurrent causation; it does not undermine the plain language of the Construction Defects Exclusion to mean that it is limited to the cost of replacing faulty construction.

The Friedbergs next argue that the Construction Defects Exclusion does not apply to loss resulting from construction defects based on Buscher v. Economy Premier Assurance Co., No. 05-544, 2006 WL 268781, at *4-5 (D. Minn. Feb. 1, 2006). The reasoning of Buscher is persuasive, but its conclusion does not apply in light of the language used in the instant Policy. See Lohstreter v. Fed. Life Ins. Co., 234 N.W. 299, 302 (Minn. 1931) (explaining that the "plain and unambiguous language of a policy controls"). Unlike the policy in Buscher, the instant Policy defines "caused by" to include "any loss that is contributed to, made worse by, or in any way results from that peril." Wolter Aff. Ex. 4, at CI00176. Thus, the Policy unambiguously includes both

14

the faulty construction itself and the results of such faulty construction.

Moreover, the Policy excludes "*any* loss caused by" faulty construction, whereas the Buscher policy only excluded "loss to property ... caused by" faulty construction. Compare id. at CI00178 (emphasis added), with Buscher, 2006 WL 268781, at *3. The word "any" in the Policy before "caused by" expands the Construction Defects Exclusion. Cf. W3i Mobile, LLC v. Westchester Fire Ins. Co., 632 F.3d 432, 437 (8th Cir. 2011) ("[T]he word 'any' when read naturally ... has an expansive meaning.") (citations and internal quotation marks omitted). Further, unlike the policy in Buscher, the Construction Defects Exclusion exempts "ensuing covered loss." See Wolter Aff. Ex. 4, at CI00178. Under the Friedbergs' proposed interpretation, there would be no need for an ensuing loss provision, because no loss could ensue from a construction defect. Such an interpretation is improper, because it would render the ensuing loss provision as mere surplusage. See In re Estate of Jobe, 590 N.W.2d 162, 166 (Minn. Ct. App. 1999) (citing U.S. ex rel. Harlan v. Bacon, 21 F.3d 209, 212 (8th Cir. 1994)). Therefore, the court concludes that the Construction Defects Exclusion is unambiguous and applies to the cost of replacing faulty construction, and loss that results from faulty construction.

**D.   Concurrent Causation**

The Friedbergs next argue that they are entitled to coverage because Chubb cannot show that the overriding cause of the loss was faulty construction. See <u>Henning Nelson Const. Co. v. Fireman's Fund Am. Life Ins. Co.</u>, 383 N.W.2d 645, 653 (Minn. 1986). In <u>Henning</u>, eight independent factors potentially caused the loss. <u>Id.</u> at 648. In the present case, the experts agree that a construction defect allowed water to enter the Friedbergs' residence. <u>See</u> Gubbe Decl. Ex. A, at CI00073, CI00075-76 (concluding that the primary cause of damage was faulty EIFS); Doggett Dep. Ex. 2, ECF No. 84, at 3 (attributing the primary cause of water damage to the faulty roof); <u>see also</u> Pls.' Mot. Opp'n 6 ("Dr. Doggett ... opined that the water damage was caused by water that was allowed to enter the wall cavities through various construction defects.").

Water intrusion is not independent of the construction defects. <u>See</u> <u>Bloom v. W. Nat'l Mut. Ins. Co.</u>, No. A05-2093, 2006 WL 1806415, at *4 (Minn. Ct. App. July 3, 2006), <u>review denied</u>, No. A05-2093 (Minn. Sept. 19, 2006). Instead, in the climate of Minnesota, water infiltration is certain when not prevented by proper construction. In other words, the construction defects allowed the inevitable physical loss. As the Sixth Circuit recently stated, "it should come as no surprise that the botched construction will permit the elements ... to enter the structure"

and cause damage. TMW Enters., Inc. v. Fed. Ins. Co., 619 F.3d 574, 576 (6th Cir. 2010). No reasonable jury could reach the conclusion that anything other than a construction defect was the overriding cause of the Friedbergs' loss. Therefore, the Construction Defects Exclusion bars the Friedbergs' claim.

**E.   Ensuing Loss Provision**

The Friedbergs next argue that the ensuing loss provision in the Construction Defects Exclusion restores coverage. Under Minnesota law, the insured bears the burden of proving that an exception to an exclusion restores coverage. See SCSC Corp., 563 N.W.2d at 314. An ensuing loss provision "brings within coverage a loss from a covered peril that follows as a consequence of an excluded peril." Sentinel Mgmt. Co. v. N.H. Ins. Co., 563 N.W.2d 296, 301 (Minn. Ct. App. 1997) (citations omitted). As long as ensuing loss is "distinct [and] separable," it is "covered even if an excluded peril is a 'but for' cause of the loss." Id. (citations omitted).

In Bloom,[7] the Minnesota Court of Appeals addressed the application of an ensuing loss provision after water intrusion occurred due to the faulty workmanship of a residential roof. See

---

[7] In a diversity action the court must determine how the Minnesota Supreme Court would decide an issue. See Raines v. Safeco Ins. Co. of Am., 637 F.3d 872, 875 (8th Cir. 2011). Bloom is an unpublished opinion of the Minnesota Court of Appeals, but the court finds Bloom persuasive in predicting how the Minnesota Supreme Court would interpret the instant Policy.

2006 WL 1806415, at *1-2. The court, applying Sentinel, explained that the resulting deterioration, rot and mold was not a "separable and distinct peril." Id. at *5. The loss resulted from water that entered due to construction defects, and therefore the water intrusion and resulting loss were "a single phenomenon ... [t]here was no intervening cause other than time." Id. (internal quotation marks omitted).

In the present case, the water damage resulted from faulty construction. Without faulty design and workmanship, water would not have entered the Friedbergs' residence; with faulty construction, water damage was inevitable. Here, as in Bloom, there was no "separable and distinct peril" that led to deterioration, rot and warping other than time. Therefore, the Friedbergs' claimed loss is not covered by the Policy's ensuing loss provision,[8] and summary judgment is warranted in favor of Chubb.

---

[8] An ensuing loss provision cannot be used to circumvent other relevant policy exclusions. See Bloom, 2006 WL 1806415, at *5. Here, as in Bloom, the instant Policy excludes loss due to deterioration, dry or wet rot and warping. See Wolter Aff. Ex. 4, CI00176-77. The court, however, does not rest its ensuing loss decision on the presence of these exclusions.

**CONCLUSION**

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment [Doc. No. 75] is granted;

2. Plaintiffs' motion for summary judgment [Doc. No. 79] is denied;

3. Defendants' motion [Doc. No. 71] to exclude expert witnesses is denied; and

4. Plaintiffs' motion [Doc. No. 119] to exclude expert witness is denied.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated:  October 25, 2011

s/David S. Doty
David S. Doty, Judge
United States District Court
